**CV-11 5369**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   OCT 3 1 2011   ★

LONG ISLAND OFFICE

=============================X
RODNEY CHESTNUT ▆▆▆▆▆▆▆▆▆▆▆▆

PLAINTIFF,

-AGAINST-

Wells Fargo Bank N.A.,
9052 Old Annapolis Road
Columbia, Maryland 21045
Att: Amy Doyle, Vice President, etal

DEFENDANTS.

=============================X

**FEDERAL COMPLAINT.**

Docket #

**SEYBERT, J**

**LINDSAY, M**

-------------------------------------

Rodney Chestnut is before this court by special appearance without waiving any
rights remedies or defenses, statutory or procedural.

-------------------------------------

**Judicial Notice to be taken Regarding Litigants without Lawyers:**

The Chestnuts appear in this action "In Propria Persona" and ask that the points and
authorities relied upon herein, and issues raised herein, must be addressed "on the merits",
*Sanders v United States,* 373 US 1, at 16, 17 (1963); and addressed with "clarity and
particularity", *McCleskey v Zant*, 111 S. Ct. 1454, at 1470-71 (1991); and afforded "a full and
fair" evidentiary hearing, *Townsend v Sain,* 372 U.S.293, at p.1 (1962). See also *Pickering v
Pennsylvania Railroad Co.*, 151 F.2d 240 (3d Cir. 1945). "Pro Se Litigants pleadings are to be
construed liberally and held to less stringent standards than lawyers" *Haines v Kerner*, 404 US
519 (1972). "Pro se litigants are entitled to certain rights not afforded litigants with lawyers."
*Signer v. Indiana University Foundation*, 741 Fed Supp 165, (S. D. Ind. 1990)

Pleadings of the Plaintiffs SHALL NOT be dismissed for lack of form or failure of process. All the pleadings are as any reasonable man/woman would understand, and:

> "And be it further enacted. That no summons, writ, declaration, return, process, judgment, or other proceedings in civil cases in any of the courts or the United States, shall be abated, arrested, quashed or reversed, for any defect or want of form, but the said courts respectively shall proceed and give judgment according as the right of the cause and matter in law shall appear unto them, without regarding any imperfections, defects or want of form in such writ, declaration, or other pleading, returns process, judgment, or course of proceeding whatsoever, except those only in cases of demurrer, which the party demurring shall specially sit down and express together with his demurrer as the cause thereof. And the said courts respectively shall and may, by virtue of this act, from time to time, amend all and every such imperfections, defects and wants of form, other than those only which the party demurring shall express as aforesaid, and may at any, time, permit either of the parties to amend any defect in the process of pleadings upon such conditions as the said courts respectively shall in their discretion, and by their rules prescribe (a)" *Judiciary Act of September 24, 1789*, Section 342, FIRST CONGRESS, Sess. 1, ch. 20, 1789.

"Court errs if court dismisses pro se litigant without instructions of how pleadings are deficient and how to repair pleadings." *Plaskey v CIA*, 953 F .2nd 25. "The trial judge should inform a pro se litigant of the proper procedure for the action he or she is obviously attempting to accomplish." *Breck v. Ulmer*, 745 P.2d 66, 75 (1987).

I.    Statement of Jurisdiction:

This is a Civil Action seeking both declaratory and injunctive relief and or damages to plaintiff and to protect the rights guaranteed by the United States Constitution.  This action is brought pursuant to title 28 U.S.C. Section 2201 and 2202 of Chapter 151, 155 and 159 and that this Court has jurisdiction over this action pursuant to title 28 U.S.C Section 1983 and 1985 of the federal code.

## PARTIES INVOLVED

PLAINTIFF:    RODNEY CHESTNUT
ADDRESS:      112 WEST BARTLETT ROAD,
              MIDDLE ISLAND, N.Y. 11953

Note: address is to change and notice will be issued at that point.

1.  Wells Fargo Bank,
    9062 Old Annapolis Road
    Columbia, Maryland 21045
    Att: Amy Doyle, Vice President

2.  Rosicki, Rosicki & Associates, PC
    51 E. Bethpage Road
    Plainview, N.Y. 11803   Attorney's involved: Owen Robinson Esq, F. Steven
    Tate Esq, Sabita Harajee Ramsaran Esq.

3. Shapiro, DiCaro, & Barack, LLC
   Landlord/Owner's Attorney
   105 Maxess Road  Suite N109
   Melville, NY 11747
   Attorney involved: John D Dello-Iacono, Esq

4. HOGAN LOVELLS US LLP
   875 Third Avenue
   New York, New York 10022
   Attorney's involved: Allison J Schoenthal, Victoria McKenney, Renee Garcia

5. Edgeton C Monroe
   3324 Baseline Rd
   Raleigh, NC 27610  Notary

6. Jeffrey R. Szymendera
   5516 Overleaf Ct
   Raleigh, NC 27615
   Vice President for MERS

7. OCWEN
   2711 Centerville Road, Suite 400
   Wilmington, DE 19808

8. Richard J Kaufman, Esq
   646 Main Street
   Port Jefferson, NY 11777  Trustee

9. Barclays Bank PLC
   200 Park Avenue
   New York, New York 10166
   Att: Adam Carysforth

10. HomEq Servicing Corporation
    1620 East Roseville Parkway
    Suite 210, Second Floor
    Roseville, CA 95661
    Att: Arthur Lyon, President

11. Securitized Asset Back Receivables LLC
    200 Park Avenue
    New York, New York 10166
    Att: Paul Menefee, Director Sherri Sharps

12. Fremont Investment & Loan
    175 N Riverview Drive
    Anaheim, CA 92808-1225
    Att: David Wells, Senior Vice President

NOTE:   Plaintiff reserves the right to amend the complaint for additional defendant's after discovery thereof the facts and circumstances and such material evidence is submitted with the clerk of this court

**II.**              **STATEMENT OF EXHAUSTION:** The evidence of exhaustion will be in detailed and exhibited herein along with other documents of fraud and lack of standing and jurisdiction.

**III.**                          **STATEMENT OF FACTS**

1.Section 10.03 **Governing Law** which is found on page 137 (See exhibit A) of the Pooling and Servicing Agreement (PSA) By which Wells Fargo claimed to adhere to which states **"shall be governed by the substantive laws of the state of New York..."**

2. Cut Off date **February 1, 2006** Page 40 of (PSA) (Ex B)

3. Closing Date **February 23, 2006** Page 38 of (PSA) (Ex B)

4. Article II Conveyance of Mortgage Loans; Representations and Warranties. Section 2.01 **(b)(i) the original Mortgage Note bearing all intervening endorsements showing complete chain of endorsement from originator to the last endorsee (b) iii the original Mortgage with evidence of recording thereon. (b)(V) the original Assignment of Mortgage for each Mortgage loan endorsed in blank (except in respect to MERS designated Loans)**. (b)(vi) the originals of all intervening assignments of mortgage(if any) evidencing a complete chain of assignment from the applicable

originator to the last endorsee ( or in the case of MERS designated loan, MERS) with evidence of recording thereon.  See Exhibit C

5.  No Assignment of Mortgage was ever filed, showing property in question, leaving Fremont Investment & Loan going to Barclay's: which bought Mortgage loan February 01, 2006 see 424b5 prospectus page 65 S-56. **Assignment of the Mortgage Loan** "Pursuant to a loan purchase and warranties agreement, Fremont Investment and Loan sold the mortgage loans without recourse to Barclays, an affiliate of depositor. Also there is no assignment of mortgage from Barclays to Wells Fargo.  See Exhibit D.

6.  **Delivery of Mortgage Loan Documents S-57**

7.  Assignment of Mortgage executed 8 months after the cut-off date for the trust, which is a direct violation of the trust and invalidates the actual document as it is fraudulent. Violation of section 2.02*

8.Available Assignment of Mortgage shows MERS as nominee for Fremont Investment and Loan, assigning security over to Wells Fargo, According to the (PSA), the mortgage was first sold to Barclays, this clearly displays the intentional fraud, as there is no assignment showing Barclays selling mortgage to wells fargo; **clearly there is a break in the chain of title. See Exhibit E**

9.  Property sold by trustee Richard Kaufman using these defective instruments, which he may have or may not have examined.

10.  Plaintiffs request information and documentation relative to all assignments, other documents, transfers and alonges that secure payment by Rodney Chestnut to the so called obligation in this account from the inception of account **number 6000170901** to the present date. Plaintiff asserts that there should be at minimum (3) assignments.

11. **Plaintiffs have been able to locate their loan number 6000170901 in the trust Securitized Asset back Receivables LLC Trust 2006-FR1 Mortgage Pass Through Certificates Series 2006-FR1.**  Plaintiff is unsure if it still resides in said trust or has been sold again. Proof of the above is hereby requested. **See Exhibit F**

12.  Plaintiff requests a copy of the intial Certification of Custodian as outlined in the 8K filing dated February 23, 2006 **"The Trustee agrees to execute and deliver or cause the custodian to execute and deliver on the closing date to the Depositor and the Master Servicer an Initial Certification in the form annexed hereto as Exhibit (E) which attests to item (ii) that it has received "A duly executed assignment, or a copy of such assignment certified by the seller as being true and complete copy of the Assignment of the Mortgage"**

**13.** Plaintiffs assert that defendants are in direct violation of PSA Article II Section 2:01 (V) **"The Original Assignment of Mortgage for each Mortgage loan endorsed in blank (except with regards to MERS designated loans)**

**(vi) the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from applicable originator to the last endorsee...**

**Including section (ix) paragraph (4) " To the extent not previously delivered to the Sponsor pursuant to this agreement, on or prior to the closing date, the Responsible Party shall deliver  to the trustee, Assignments of Mortgages, in blank, for each Mortgage Loan that is not a MERS designated loan. No later than (30) thirty business days following the later of the closing date of receipt by the servicer..."Wells Fargo Bank, N.A., as Trustee Under Pooling and Servicing Agreement Dated as of February 1, 2006, Securitized Asset back Receivables LLC Trust 2006-FR1 Mortgage Pass Through Certificates Series 2006-FR1.**

**14.** Defendants did not assign the deed of trust within the guidelines as outlined in item 11 above, that being the case should have generated a Delay Delivery Certification.  Plaintiff seeks production of this document.

**15.** In accordance with the PSA, Article II 2:1 Within 90 days after the closing date, the Trustee shall ascertain that all documents identified in the document certification and exception report in the form attached hereto as exhibit F are in their possession, and shall deliver to the Depositor and the Servicer a document certification and exception report, in the form annexed hereto as exhibit F, to the effect that as to each mortgage loan listed in the Mortgage loan schedule. Plaintiff seeks production of this document.

**16.** In line with the PSA, Article II Section 2.5 **" The Trustee acknowledges the transfer and assignment to it of the trust fund and concurrently with such transfer and assignment and delivered to or upon the order of the depositor the Certificates in authorized denominations evidencing directly or indirectly the entire ownership of the trust fund"** Plaintiff seeks production of these documents.

**17.** Plaintiff seeks production of a certified copy of the Fidelity Bond as required under PSA Article III Section 3.13b.

**18.** Plaintiff seeks production of a certified copy of the errors and Omissions Insurance Policy as defined in the PSA, Article III 3.13b.

19. Certified copies of the U.S. informational Tax Forms 1096 and the accompanying 1099 OID's and tax forms 8300 for any cash payments over $10,000.00 as evidenced in the court as the Certificate Security or promissory note. The 1099OID's will identify who the payor and the recipient of the funds or cash proceeds were under **SFAS[Statement of Financial Accounting Standards] #95 and IAS[International Accounting Standards] #7.6** containing the inflows and outflows of cash and cash equivalents on the Balance Sheet FR 2046 from securitization of the off balance sheet receivables and payables which identify both the source or principal from which the funds or cash proceeds were derived.

**20. The trust which held mortgage # 6000170901, Wells Fargo Bank, N.A., as Trustee Under Pooling and Servicing Agreement Dated as of February 1, 2006, Securitized Asset back Receivables LLC Trust 2006-FR1 Mortgage Pass Through Certificates Series 2006-FR1. Filed form 15 with the SEC on January 22, 2007; see (Exh E.) which is the Certification and Notification of Termination of Registration, nor do they appear in the IRS Publication 938 for the years 2007, 2008 and 2009. These facts point towards a trust that was no longer active. A Dissolved trust has no standing or capacity to bring an action in a court of law, neither does the acting trustee. These facts lead to one conclusion, Wells Fargo Bank, N.A and acting as trustee for the aforementioned trust, never had standing or capacity to bring action in this case, which has lead to the wrongful foreclosure and the attempted eviction of the rightful owner Rodney Chestnut. See Exhibit J.**

**WHEREFORE,** your deponent RODNEY CHESTNUT the plaintiff prays that the Court award the following relief:

    (a) Injunctive relief preventing the defendants from taking the real property from plaintiff, along with a stay of all eviction proceedings by defendants herein;

    (b) Injunctive relief staying the eviction pending a hearing in district court on the issues raised in the plaintiffs moving papers;

    (c) Directing the  defendants to provide evidence of legal standing and monies from the surplus sale;

    (d) Directing clerk of the county to notify the lower court for the entire record in both supreme court and civil housing;

    (e) Damages to be determined after hearing;

    (f) Attorney's fees and cost pursuant to 42 U.S.C 1988

## DEMAND FOR A JURY TRIAL

As to those issues triable by jury, plaintiff demands a jury trial.

## FIRST CAUSE OF ACTION

### DEFENDANT VIOLATED THE CONSTITUTIONAL RIGHTS OF THE PLAINTIFF HEREIN WHEN HE PARTICIPATED IN THE ILLEGAL FORECLOSURE ACTION AND THE THEFT OF EQUITY IN VIOLATION OF THE UNITED STATES CONSTITUTIONAL RIGHTS OF DUE PROCESS.

## SECOND CAUSE OF ACTION

### DEFENDANT PARTICIPATED IN FRAUD, UNJUST ENRICHMENT AND OTHER SCHEMES TO COMMIT THEFT OF EQUITY AND TO USE THE LEGAL SYSTEM FOR THE PURPOSE TO COMMIT SUCH FRAUDULENT ACTIONS.

WHEREFORE, your deponent respectfully prays for a judgment against the defendants for damages in the sum of $ 1, 750,000.00 Dollars for compensatory and a jury trial for punitive damages. That any future retaliation against plaintiff for his protected activities in connection with this litigation will be made part of the jury decision to award punitive damages.

I STATE UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT PURSUANT TO 28 USC 1746.

DATE: October 28, 2011

By /s/ _Rodney Chestnut_

Rodney Chestnut, Pro-Se

EXHIBIT A

```
                                 se888936-ex4
<DOCUMENT>
<TYPE>EX-4
<SEQUENCE>3
<FILENAME>se888936-ex4.txt
<DESCRIPTION>POOLING AND SERVICING AGREEMENT
<TEXT>
```

Exhibit 4

================================================================================

SECURITIZED ASSET BACKED RECEIVABLES LLC,

Depositor,

HOMEQ SERVICING CORPORATION,

Servicer,

MORTGAGERAMP, INC.,

Loan Performance Advisor,

FREMONT INVESTMENT & LOAN,

Responsible Party,

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,

Trustee

-----------------------------------------------------

POOLING AND SERVICING AGREEMENT

Dated as of February 1, 2006

-----------------------------------------------------

SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-FR1

MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-FR1

================================================================================

<PAGE>

ARTICLE I

DEFINITIONS

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

Section 2.01    Conveyance of Mortgage Loans.................................
Section 2.02    Acceptance by the Trustee of the Mortgage Loans.............
Section 2.03    Representations, Warranties and Covenants of the
                Responsible Party and the Servicer; Remedies for
                Breaches of Representations and Warranties with

Page 1

se888936-ex4

Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless (i) it shall have first received an Opinion of Counsel, which opinion shall not be an expense of the Trustee or the Trust Fund, to the effect that such amendment will not cause the imposition of any tax on any Trust REMIC or the Certificateholders or cause any such REMIC to fail to qualify as a REMIC or the grantor trust to fail to qualify as a grantor trust at any time that any Certificates are Outstanding and (ii) the party seeking such amendment shall have provided written notice to the Rating Agencies (with a copy of such notice to the Trustee) of such amendment, stating the provisions of the Agreement to be amended.

Notwithstanding the foregoing provisions of this Section 10.01, with respect to any amendment that significantly modifies the permitted activities of the Trustee or the Servicer, any Certificate beneficially owned by the Depositor shall be deemed not to be Outstanding (and shall not be considered when determining the percentage of Certificateholders consenting or when calculating the total number of Certificates entitled to consent) for purposes of determining if the requisite consents of Certificateholders under this Section 10.01 have been obtained.

Promptly after the execution of any amendment to this Agreement requiring the consent of Certificateholders, the Trustee shall furnish written notification of the substance or a copy of such amendment to each Certificateholder and each Rating Agency.

It shall not be necessary for the consent of Certificateholders under this Section 10.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

Nothing in this Agreement shall require the Trustee to enter into an amendment without receiving an Opinion of Counsel (which Opinion shall not be an expense of the Trustee or the Trust Fund), satisfactory to the Trustee that (i) such amendment is permitted and is not prohibited by this Agreement and that all requirements for amending this Agreement have been complied with and (ii) either (A) the amendment does not adversely affect in any material respect the interests of any Certificateholder or (B) the conclusion set forth in the immediately preceding clause (A) is not required to be reached pursuant to this Section 10.01.

Notwithstanding the foregoing, any amendment to this Agreement shall require the prior written consent of the Swap Provider if such amendment materially and adversely affects the rights or interests of the Swap Provider.

Section 10.02 Recordation of Agreement; Counterparts. This Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Servicer at the direction and expense of the Depositor, but only upon receipt of an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 10.03 Governing Law. THIS AGREEMENT SHALL BE CONSTRUED
Page 137

se888936-ex4

IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 10.04 Intention of Parties. It is the express intent of the parties hereto that the conveyance (i) of the Mortgage Loans by the Depositor and (ii) of the Trust Fund by the Depositor to the Trustee each be, and be construed as, an absolute sale thereof. It is, further, not the intention of the parties that such conveyances be deemed a pledge thereof. However, in the event that, notwithstanding the intent of the parties, such assets are held to be the property of the Depositor, as the case may be, or if for any other reason this Agreement is held or deemed to create a security interest in either such assets, then (i) this Agreement shall be deemed to be a security agreement within the meaning of the Uniform Commercial Code of the State of New York and (ii) the conveyances provided for in this Agreement shall be deemed to be an assignment and a grant by the Depositor to the Trustee, for the benefit of the Certificateholders, of a security interest in all of the assets transferred, whether now owned or hereafter acquired.

The Depositor, for the benefit of the Certificateholders, shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Trust Fund, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Agreement. The Depositor shall arrange for filing any Uniform Commercial Code continuation statements in connection with any security interest granted or assigned to the Trustee for the benefit of the Certificateholders.

Section 10.05 Notices. (a) The Trustee shall use its best efforts to promptly provide notice to each Rating Agency with respect to each of the following of which it has actual knowledge:

1. Any material change or amendment to this Agreement;

2. The occurrence of any Event of Default that has not been cured;

3. The resignation or termination of the Servicer or the Trustee and the appointment of any successor;

4. The repurchase or substitution of Mortgage Loans pursuant to Section 2.03; and

5. The final payment to Certificateholders.

(b) In addition, the Trustee shall promptly make available on its internet website to each Rating Agency copies of the following:

1. Each report to Certificateholders described in Section 4.03; and

2. Any notice of a purchase of a Mortgage Loan pursuant to Section 2.02, 2.03 or 3.11.

(c) All directions, demands, consents and notices hereunder shall be in writing and shall be deemed to have been duly given when delivered to: (a) in the case of the Depositor, Securitized Asset Backed Receivables LLC, 200 Park Avenue, New York, New York 10166, Attention: General Counsel, Facsimile: (212) 412-7519, or such other address as the Depositor may hereafter furnish to the Servicer, the Responsible Party and the Trustee; (b) in the case of the Servicer to HomEq Servicing Corporation, 4837 Watt Avenue, North

Page 138

EXHIBIT B

se888936-ex4

```
<DOCUMENT>
<TYPE>EX-4
<SEQUENCE>3
<FILENAME>se888936-ex4.txt
<DESCRIPTION>POOLING AND SERVICING AGREEMENT
<TEXT>
```

Exhibit 4

====================================================================

SECURITIZED ASSET BACKED RECEIVABLES LLC,

Depositor,

HOMEQ SERVICING CORPORATION,

Servicer,

MORTGAGERAMP, INC.,

Loan Performance Advisor,

FREMONT INVESTMENT & LOAN,

Responsible Party,

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,

Trustee

---------------------------------------------------

POOLING AND SERVICING AGREEMENT

Dated as of February 1, 2006

---------------------------------------------------

SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-FR1

MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-FR1

====================================================================

<PAGE>

ARTICLE I

DEFINITIONS

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

Section 2.01    Conveyance of Mortgage Loans.................................
Section 2.02    Acceptance by the Trustee of the Mortgage Loans.............
Section 2.03    Representations, Warranties and Covenants of the
                Responsible Party and the Servicer; Remedies for
                Breaches of Representations and Warranties with
Page 1

se888936-ex4

Class R Certificates: All Certificates bearing the class designation of "Class R".

Class UT-R Interest: The sole class of "residual interest" in the Upper Tier REMIC evidenced by the Class R Certificate.

Class X Certificates: All Certificates bearing the class designation of "Class X".

Class X Distributable Amount: On any Distribution Date, the sum of (i) as a distribution in respect of interest, the amount of interest that has accrued on the Class X Interest (as set forth in the Preliminary Statement) and not applied as an Extra Principal Distribution Amount on such Distribution Date, plus any such accrued interest remaining undistributed from prior Distribution Dates, plus (without duplication) (ii) as a distribution in respect of principal, any portion of the principal balance of the Class X Interest which is distributable as a Subordination Reduction Amount, minus (iii) any amounts paid from the Excess Reserve Fund Account to pay any Basis Risk Carry Forward Amount or any Swap Termination Payment.

Class X Interest: The Upper Tier REMIC Regular Interest represented by the Class X Certificates as specified and described in the Preliminary Statement and the related footnote thereto.

Closing Date: February 23, 2006.

Closing Date Deposit Amount: $592,495.85 (all of which is allocable to principal) deposited by the Depositor into the Distribution Account on the Closing Date. $264,750.29 of the Closing Date Deposit Amount shall be attributable to the Group I Mortgage Loans and $327,745.56 of the Closing Date Deposit Amount shall be attributable to the Group II Mortgage Loans.

Code: The Internal Revenue Code of 1986, including any successor or amendatory provisions.

Collection Account: As defined in Section 3.10(a).

Combined Loan-to-Value Ratio or CLTV: As of any date and as to any Second-Lien Mortgage Loan, the ratio (expressed as a percentage) of the (a) sum of (i) the outstanding principal balance of the Second-Lien Mortgage Loan and (ii) the outstanding principal balance as of such date of any mortgage loan or mortgage loans that are senior or equal in priority to the Second-Lien Mortgage Loan and which are secured by the same Mortgaged Property to (b) (i) in the case of a purchase, the lesser of (A) the sale price of the Mortgaged Property and (B) its appraised value at the time of sale, or (ii) in the case of a refinancing or modification, the appraised value of the Mortgaged Property at the time of the refinancing or modification.

Commission: The United States Securities and Exchange Commission.

Compensating Interest: For any Distribution Date, the lesser of (a) the amount, if any, by which the Prepayment Interest Shortfall, if any, for such Distribution Date, with respect to voluntary Principal Prepayments in Full (excluding any payments made upon liquidation of any Mortgage Loan) exceeds all Prepayment Interest Excesses for such Distribution Date on the Mortgage Loans, and (b) the amount of the Servicing Fee payable to the Servicer for such Distribution Date.

Condemnation Proceeds: All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation.

se888936-ex4

corresponding to a Pooling-Tier REMIC-2 IO Interest.

Corresponding Upper Tier REMIC Regular Interest: As defined in the Preliminary Statement.

Covered Loan: A Mortgage Loan categorized as Covered pursuant to Appendix E of Standard & Poor's Glossary.

Cumulative Loss Percentage: With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate amount of Realized Losses incurred from the Cut-off Date to the last day of the calendar month preceding the month in which such Distribution Date occurs and the denominator of which is the Cut-off Date Pool Principal Balance of the Mortgage Loans.

Cumulative Loss Trigger Event: If, with respect to any Distribution Date, the quotient (expressed as a percentage) of (x) the aggregate amount of Realized Losses incurred since the Cut-off Date through the last day of the related Due Period, divided by (y) the Cut-off Date Pool Principal Balance, exceeds the applicable Cumulative Loss Percentages set forth below with respect to such Distribution Date:

```
<TABLE>
<CAPTION>
```

| Distribution Date Occurring In | Cumulative Loss Percentage |
|---|---|
| `<S>` | `<C>` |
| March 2008 through February 2009 additional 1/12th of 2.050% for each September 2008) | 1.700% for the first month, plus an month thereafter (e.g., 2.725% in |
| March 2009 through February 2010 additional 1/12th of 2.100% for each September 2009) | 3.750% for the first month, plus an month thereafter (e.g., 4.800% in |
| March 2010 through February 2011 additional 1/12th of 1.700% for each September 2010) | 5.850% for the first month, plus an month thereafter (e.g., 6.700% in |
| March 2011 through February 2012 additional 1/12th of 0.650% for each September 2011) | 7.550% for the first month, plus an month thereafter (e.g., 7.875% in |
| March 2012 and thereafter | 8.200% |

```
</TABLE>
```

Custodial File: With respect to each Mortgage Loan, the file retained by the Trustee consisting of items (a) - (h) as listed on Exhibit K hereto.

Cut-off Date:  February 1, 2006.

Cut-off Date Pool Principal Balance: The aggregate Stated Principal Balances of all Mortgage Loans as of the Cut-off Date.

Cut-off Date Principal Balance: As to any Mortgage Loan, the Stated Principal Balance thereof as of the close of business on the Cut-off Date plus the portion of the Closing Date Deposit Amount allocable to principal.

Data Tape Information: With respect to each Mortgage Loan, the

EXHIBIT C

<DOCUMENT>
<TYPE>EX-4
<SEQUENCE>3
<FILENAME>se888936-ex4.txt
<DESCRIPTION>POOLING AND SERVICING AGREEMENT
<TEXT>

se888936-ex4

Exhibit 4

SECURITIZED ASSET BACKED RECEIVABLES LLC,

Depositor,

HOMEQ SERVICING CORPORATION,

Servicer,

MORTGAGERAMP, INC.,

Loan Performance Advisor,

FREMONT INVESTMENT & LOAN,

Responsible Party,

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,

Trustee

POOLING AND SERVICING AGREEMENT

Dated as of February 1, 2006

SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-FR1

MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-FR1

<PAGE>

ARTICLE I

DEFINITIONS

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

Section 2.01    Conveyance of Mortgage Loans...............................
Section 2.02    Acceptance by the Trustee of the Mortgage Loans.............
Section 2.03    Representations, Warranties and Covenants of the
                Responsible Party and the Servicer; Remedies for
                Breaches of Representations and Warranties with

Page 1

se888936-ex4

Preliminary Statement.

U.S. Person: (i) A citizen or resident of the United States; (ii) a corporation (or entity treated as a corporation for tax purposes) created or organized in the United States or under the laws of the United States or of any State thereof, including, for this purpose, the District of Columbia; (iii) a partnership (or entity treated as a partnership for tax purposes) organized in the United States or under the laws of the United States or of any State thereof, including, for this purpose, the District of Columbia (unless provided otherwise by future Treasury regulations); (iv) an estate whose income is includible in gross income for United States income tax purposes regardless of its source; or (v) a trust, if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have authority to control substantial decisions of the trust. Notwithstanding the last clause of the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, may elect to continue to be U.S. Persons.

Voting Rights: The portion of the voting rights of all of the Certificates which is allocated to any Certificate. As of any date of determination, (a) 1% of all Voting Rights shall be allocated to the Class X Certificates, if any (such Voting Rights to be allocated among the holders of Certificates of each such Class in accordance with their respective Percentage Interests), (b) 1% of all Voting Rights shall be allocated to the Class P Certificates, if any, and (c) the remaining Voting Rights shall be allocated among Holders of the remaining Classes of Certificates in proportion to the Certificate Balances of their respective Certificates on such date.

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

Section 2.01 Conveyance of Mortgage Loans. (a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund. On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b) In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Trustee for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) the original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee by an authorized officer. To the extent that there is no room on the face of the Mortgage Notes for endorsements, the endorsement may be contained on an allonge, if state law so allows and the Trustee is so advised in writing by the Responsible Party that state law so allows;

(ii) the original of any guarantee executed in connection with the Mortgage Note;

(iii) the original Mortgage with evidence of recording thereon. If, in connection with any Mortgage Loan, the original Mortgage

Page 64

Exhibit D

se885565-424b5

```
<DOCUMENT>
<TYPE>424B5
<SEQUENCE>1
<FILENAME>se885565-424b5.txt
<TEXT>
```

PROSPECTUS SUPPLEMENT DATED FEBRUARY 21, 2006

(To Prospectus dated May 20, 2005)

$633,287,000
(Approximate)
Securitized Asset Backed Receivables LLC Trust 2006-FR1
Issuing Entity
Securitized Asset Backed Receivables LLC
Depositor
Barclays Bank PLC
Sponsor
HomEq Servicing Corporation
Servicer

Mortgage Pass-Through Certificates, Series 2006-FR1

o  Securitized Asset Backed Receivables LLC Trust 2006-FR1 is issuing
   certificates in 13 classes, but is offering only 9 classes through this
   prospectus supplement.

```
<TABLE>
<CAPTION>
```

| Class | Average Life to Call/ Expected Principal Maturity (years) (3) (4) | Amount(1) | Principal Payment Window to Call/Maturity (3) (4) | Expected Ratings (S&P/Moody's/Fitch/DBRS) | Pass-Through Rate (2) |
|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | | `<C>` |
| A-2A | 1.00/1.00 | $263,225,000 | 03/06-04/08 / 03/06-04/08 | AAA/Aaa/AAA/AAA | 1 mo. LIBOR + 0.070% |
| A-2B | 3.00/3.00 | $101,030,000 | 04/08-11/10 / 04/08-11/10 | AAA/Aaa/AAA/AAA | 1 mo. LIBOR + 0.190% |
| A-2C | 6.82/8.04 | $76,634,000 | 11/10-01/14 / 11/10-10/23 | AAA/Aaa/AAA/AAA | 1 mo. LIBOR + 0.290% |
| M-1 | 5.35/5.95 | $73,695,000 | 07/09-01/14 / 07/09-08/21 | AA/Aa2/AA+/AA(high) | 1 mo. LIBOR + 0.400% |
| M-2 | 5.29/5.85 | $59,846,000 | 05/09-01/14 / 05/09-06/20 | A+/A2/A+/A(high) | 1 mo. LIBOR + 0.570% |
| M-3 | 5.28/5.79 | $15,827,000 | 04/09-01/14 / 04/09-01/19 | A+/A3/A/A(high) | 1 mo. LIBOR + 0.660% |
| B-1 | 5.27/5.75 | $15,827,000 | 04/09-01/14 / 04/09-07/18 | A/Baa1/A-/A | 1 mo. LIBOR + 1.200% |
| B-2 | 5.27/5.71 | $14,343,000 | 04/09-01/14 / 04/09-12/17 | A-/Baa2/BBB+/A(low) | 1 mo. LIBOR + 1.400% |
| B-3 | 5.26/5.65 | $12,860,000 | 03/09-01/14 / 03/09-04/17 | BBB+/Baa3/BBB/BBB(high) | 1 mo. LIBOR + 2.000% |

```
</TABLE>
```

(1)  Subject to a variance of plus or minus 5%.

(2)  The pass-through rate for each class of certificates will be equal to the
     sum of one month LIBOR plus a fixed margin, subject to caps on those
     pass-through rates as described in this prospectus supplement under
     "Description of the Certificates--Distributions of Interest and

Page 1

se885565-424b5

availability through DTC of definitive certificates. Upon delivery of definitive certificates, the trustee will reissue the book-entry certificates as definitive certificates to beneficial owners. Distributions of principal of, and interest on, the book-entry certificates will thereafter be made by the trustee, or a paying agent on behalf of the trustee, directly to holders of definitive certificates in accordance with the procedures set forth in the pooling and servicing agreement.

Definitive certificates will be transferable and exchangeable at the offices of the trustee, its agent or the certificate registrar designated from time to time for those purposes. As of the closing date, the trustee designates its offices located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479 for those purposes. No service charge will be imposed for any registration of transfer or exchange, but the trustee may require distribution of a sum sufficient to cover any tax or other governmental charge imposed in connection with the transfer or exchange.

Assignment of the Mortgage Loans

Pursuant to a mortgage loan purchase and warranties agreement, Fremont Investment & Loan sold the mortgage loans, without recourse, to Barclays, an affiliate of the depositor, and Barclays will sell, transfer, assign, set over and otherwise convey the mortgage loans, including all principal outstanding as of, and interest due and accruing after, the close of business on the cut-off date, without recourse, to the depositor on the closing date. Pursuant to the pooling and servicing agreement, the depositor will sell, without recourse, to the trust, all right, title and interest in and to each mortgage loan, including all principal outstanding as of, and interest due after, the close of business on the cut-off date. Each such transfer will convey all right, title and interest in and to (a) principal outstanding as of the close of business on the cut-off date (after giving effect to payments of principal due on that date, whether or not received) and (b) interest due and accrued on each such mortgage loan after the cut-off date. However, Barclays will not convey to the depositor, and will retain all of its right, title and interest in and to (x) principal due on each mortgage loan on or prior to the cut-off date and principal prepayments in full and curtailments (i.e., partial prepayments) received on each such mortgage loan prior to the cut-off date and (y) interest due and accrued on each mortgage loan on or prior to the cut-off date.

S-57

<PAGE>

Delivery of Mortgage Loan Documents

In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the trustee, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:

(a) the original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee;

(b) the original of any guaranty executed in connection with the mortgage note (if provided);

(c) the related original mortgage and evidence of its recording or, in certain limited circumstances, a copy of the mortgage certified by the originator, escrow company, title company, or closing attorney;

(d) originals of all assumption, modification, consolidation and extension agreements, with evidence of recording on them;

se885565-424b5

(e) the mortgage assignment(s), or copies of them certified by the applicable originator, escrow company, title company, or closing attorney, if any, showing a complete chain of assignment from the originator of the related mortgage loan to the last endorsee - which assignment may, at the originator's option, be combined with the assignment referred to in clause (f) below;

(f) a mortgage assignment in recordable form, which, if acceptable for recording in the relevant jurisdiction, may be included in a blanket assignment or assignments, of each mortgage from the last endorsee in blank;

(g) an original mortgagee title insurance policy or, in the event the original policy is unavailable, a certified true copy of the related policy binder or commitment for title certified to be true and complete by the title insurance company; and

(h) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the mortgage (if provided).

Pursuant to the pooling and servicing agreement, the trustee will agree to execute and deliver on or prior to the closing date an acknowledgment of receipt of the original mortgage note, item (a) above, with respect to each of the mortgage loans delivered to the trustee, with any exceptions noted. The trustee will agree, for the benefit of the holders of the certificates, to review, or cause to be reviewed, each mortgage file within ninety days after the closing date--or, with respect to any Substitute Mortgage Loan delivered to the trustee, within 30 days after the receipt of the mortgage file by the trustee--and to deliver a certification generally to the effect that, as to each mortgage loan listed in the schedule of mortgage loans,

o    all documents required to be reviewed by it pursuant to the pooling and servicing agreement are in its possession;

o    each such document has been reviewed by it and appears regular on its face and relates to such mortgage loan;

o    based on its examination and only as to the foregoing documents, certain information set forth on the schedule of mortgage loans accurately reflects the information set forth in the mortgage file delivered on such date; and

o    each mortgage note has been endorsed as provided in the pooling and servicing agreement.

S-58

<PAGE>

If the trustee, during the process of reviewing the mortgage files, finds any document constituting a part of a mortgage file that is not executed, has not been received or is unrelated to the mortgage loans, or that any mortgage loan does not conform to the requirements above or to the description of the requirements as set forth in the schedule of mortgage loans, the trustee is required to promptly so notify the responsible party, the servicer and the depositor in writing. The responsible party will be required to use reasonable efforts to cause to be remedied a material defect in a document constituting part of a mortgage file of which it is so notified by the trustee. If, however, within thirty days after the depositor's notice of the defect, the responsible party has not caused the defect to be remedied, the responsible party will be required to either (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan. The substitution or repurchase is required to be effected in the same manner as a substitution or

EXHIBIT E

```
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>se888936-8k.txt
<DESCRIPTION>CURRENT REPORT
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported)      February 23, 2006
                                                 ------------------------------

Securitized Asset Backed Receivables LLC Trust 2006-FR1
-------------------------------------------------------
(Exact name of issuing entity)

Barclays Bank PLC
-------------------------------------------------------
(Exact name of sponsor as specified in its charter)

Securitized Asset Backed Receivables LLC
-------------------------------------------------------
(Exact name of registrant as specified in its charter)

| Delaware | 333-123990-07 | 37-1472598 |
|---|---|---|
| (State or other jurisdiction of incorporation of Registrant) | (Commission File Number of issuing entity) | (IRS Employer Identification No. of Registrant) |

200 Park Avenue, New York, New York                              10016
-----------------------------------------------------------------------
(Address of principal executive offices of Registrant)       (Zip Code)

Registrant's telephone number, including area code      (212) 412-4000
                                                  ----------------------------

Not Applicable
-----------------------------------------------------------------------
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR
230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

<PAGE>

Item 8.01.  Other Events.

     On February 23, 2006, Securitized Asset Backed Receivables LLC (the "Company") caused the issuance, pursuant to a Pooling and Servicing Agreement, dated as of February 1, 2006 (the "Pooling and Servicing Agreement"), by and among the Company, as depositor, HomEq Servicing Corporation, as servicer, Fremont Investment & Loan, as responsible party, MortgageRamp, Inc., as loan performance advisor and Wells Fargo Bank, National Association, as trustee, of Securitized Asset Backed Receivables LLC Trust 2006-FR1 Mortgage Pass-Through Certificates, Series 2006-FR1 (the "Certificates"). The Class A-2A, Class A-2B, Class A-2C, Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates, having an aggregate initial principal amount of $633,287,000, were sold to Barclays Capital Inc. (the "Underwriter"), pursuant to an Underwriting Agreement, dated as of February 21, 2006, by and between the Company and the Underwriter.

     Attached as exhibits are certain agreements and opinion letters that were executed and delivered in connection with the issuance of the Certificates.


<PAGE>

Item 9.01.  Financial   Statements,   Pro  Forma  Financial   Information  and Exhibits.

(c)   Exhibits

Exhibit 1            Underwriting Agreement, dated as of February 21, 2006, by and between Securitized Asset Backed Receivables LLC, as depositor and Barclays Capital Inc., as underwriter.

Exhibit 4            Pooling and Servicing Agreement, dated as of February 1, 2006, by and among the Company, as depositor, HomEq Servicing Corporation, as servicer, Fremont Investment & Loan, as responsible party, MortgageRamp, Inc., as loan performance advisor, and Wells Fargo Bank, National Association, as trustee.

Exhibit 5            Legality Opinion of Cadwalader, Wickersham & Taft LLP, dated as of February 23, 2006.

Exhibit 8            Tax Opinion of Cadwalader, Wickersham & Taft LLP, dated as of February 23, 2006 (included as part of Exhibit 5).

Exhibit 10.1         Interest Rate Swap Agreement, dated as of February 23, 2006 between Barclays Bank PLC, the swap provider and Wells Fargo Bank, National Association, the trustee (included as part of Exhibit T to Exhibit 4).

Exhibit 10.2         Interest Rate Cap Agreement, dated February 23, 2006, between Barclays Bank PLC, the cap provider and Wells Fargo Bank, National Association, the trustee, relating to the Class M Certificates (included as Exhibit U to Exhibit 4).

Exhibit 10.3        Interest Rate Cap Agreement, dated February 23, 2006, between
                    Barclays Bank PLC, the cap provider and Wells Fargo Bank,
                    National Association, the trustee, relating to the Class B
                    Certificates (included as Exhibit V to Exhibit 4).

Exhibit 23          Consent of Cadwalader, Wickersham & Taft LLP (included as part
                    of Exhibit 5).


<PAGE>


        Pursuant to the requirements of the Securities Exchange Act of 1934,
the registrant has caused this report to be signed on its behalf by the
undersigned thereunto duly authorized.


Date: March 10, 2006                    SECURITIZED ASSET BACKED
                                        RECEIVABLES LLC


                                        By: /s/ Paul Menefee
                                            ------------------------------------
                                            Name:  Paul Menefee
                                            Title: Director



<PAGE>

Item 601(a) of
Regulation S-K                                              Paper (P) or
Exhibit No.         Description                             Electronic (E)
-----------         -----------                             --------------

| Item 601(a) of Regulation S-K Exhibit No. | Description | Paper (P) or Electronic (E) |
| --- | --- | --- |
| 1 | Underwriting Agreement, dated as of February 21, 2006, by and between Securitized Asset Backed Receivables LLC, as depositor and Barclays Capital Inc., as underwriter. | (E) |
| 4 | Pooling and Servicing Agreement, dated as of February 1, 2006, by and among the Company, as depositor, HomEq Servicing Corporation, as servicer, Fremont Investment & Loan, as responsible party, MortgageRamp, Inc., as loan performance advisor, and Wells Fargo Bank, National Association, as trustee. | (E) |
| 5 | Legality Opinion of Cadwalader, Wickersham & Taft LLP, dated as of February 23, 2006. | (E) |
| 8 | Tax Opinion of Cadwalader, Wickersham & Taft LLP, dated as of February 23, 2006 (included as part of Exhibit 5). | (E) |
| 10.1 | Interest Rate Swap Agreement, dated as of February 23, 2006 between Barclays Bank PLC, the swap provider and Wells Fargo Bank, National Association, the trustee (included as part of Exhibit T to Exhibit 4). | (E) |

| 10.2 | Interest Rate Cap Agreement, dated February 23, 2006, between Barclays Bank PLC, the cap provider and Wells Fargo Bank, National Association, the trustee, relating to the Class M Certificates (included as Exhibit U to Exhibit 4). | (E) |
| 10.3 | Interest Rate Cap Agreement, dated February 23, 2006, between Barclays Bank PLC, the cap provider and Wells Fargo Bank, National Association, the trustee, relating to the Class B Certificates (included as Exhibit V to Exhibit 4). | (E) |
| 23 | Consent of Cadwalader, Wickersham & Taft LLP (included as part of Exhibit 5). | (E) |

```
</TEXT>
</DOCUMENT>
```

EXHIBIT F

se888936-ex4

```
<DOCUMENT>
<TYPE>EX-4
<SEQUENCE>3
<FILENAME>se888936-ex4.txt
<DESCRIPTION>POOLING AND SERVICING AGREEMENT
<TEXT>
```

Exhibit 4

================================================================================

SECURITIZED ASSET BACKED RECEIVABLES LLC,

Depositor,

HOMEQ SERVICING CORPORATION,

Servicer,

MORTGAGERAMP, INC.,

Loan Performance Advisor,

FREMONT INVESTMENT & LOAN,

Responsible Party,

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,

Trustee

----------------------------------------------------

POOLING AND SERVICING AGREEMENT

Dated as of February 1, 2006
----------------------------------------------------

SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-FR1

MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-FR1

================================================================================

```
<PAGE>
```

ARTICLE I

DEFINITIONS

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

Section 2.01    Conveyance of Mortgage Loans.................................
Section 2.02    Acceptance by the Trustee of the Mortgage Loans.............
Section 2.03    Representations, Warranties and Covenants of the
                Responsible Party and the Servicer; Remedies for
                Breaches of Representations and Warranties with

Page 1

```
se888936-ex4
5000172815
5000173077
5000173107
5000173223
5000173601
5000175637
5000175679
5000176080
6000161525
6000166932
6000167686
6000170901
6000176510
6000176954
6000177234
6000177265
6000177363
6000179493
7000152366
7000158450
7000158537
7000158691
7000162135
7000163089
7000163295
7000165231
7000165256
7000165304
7000166524
7000166624
8000043902
8000051442
8000051794
8000054268
8000058426
8000058808
8000060009
8000060382
8000060497
8000060555
8000060654
1000268940
6000179042
1000273049
5000166893
5000173255
7000165227
7000165298
1000276754
7000155594
1000259931
5000158100
5000163189
5000172197
6000165864
6000177941
6000179431
6000180875
8000055692
8000056814
8000056836
8000058565
8000060690
```

Page 158

EXHIBIT G

07/14/06   10:04 FAX 631 474                     REDA'S SERVICE AGENCY                              ☎100

H2-0932-5-0J
0200
498.00
O2-00
029,000
MTX#2910.00

Return To:
FREMONT INVESTMENT & LOAN
P.O. BOX 34078
FULLERTON, CA  92834-34078

Prepared By:
BARBARA LICON

5000170901

——————— [Space Above This Line For Recording Data] ———————

# MORTGAGE MIN 1001644-5000170901-3

**WORDS USED OFTEN IN THIS DOCUMENT**
(A) "Security Instrument." This document, which is dated  August 10, 2005
together with all Riders to this document, will be called the "Security Instrument."
(B) "Borrower." RODNEY CHESTNUT AND DAWN CHESTNUT, HUSBAND AND WIFE

whose address is  112 W BARTLETT ROAD   , MIDDLE ISLAND, NY 11938
                                    sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing under
the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel.
(888) 679-MERS. FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE
MORTGAGEE OF RECORD.          *64318 Miller Rel
(D) "Lender." FREMONT INVESTMENT & LOAN

will be called "Lender." Lender is a corporation or association which exists under the laws of
CALIFORNIA                          , Lender's address is
2727 EAST IMPERIAL HIGHWAY, BREA CA 92821

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3033 1/01

-6A(NY) (0307).03
Page 1 of 17                   Initials:
VMP Mortgage Solutions, Inc. (800)521-7291

PREMISES ARE OR WILL BE
IMPROVED BY A ONE OR
TWO FAMILY DWELLING ONLY

Exhibit A Page 2  of 24

(E) "Note." The note signed by Borrower and dated August 10, 2005                , will be called the "Note." The Note shows that I owe Lender Two Hundred Eighty Thousand and No/100 —

——————————————————————————————————————

                              Dollars (U.S. $        280,000.00        )
plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by  September 1, 2035

(F) "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

(G) "Loan." The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(I) "Riders." All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check which box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law." All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(K) "Community Association Dues, Fees, and Assessments." All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(L) "Electronic Funds Transfer." "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items." Those items that are described in Section 3 will be called "Escrow Items."

(N) "Miscellaneous Proceeds." "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation, or to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(O) "Mortgage Insurance." "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment." The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(Q) "RESPA." "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Initials _____

-6A(NY) (0005).02                    Page 2 of 17                    Form 3033 1/01

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to Lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

### DESCRIPTION OF THE PROPERTY

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

(A) The Property which is located at

112 W BARTLETT RD                                                              [Street]

MIDDLE ISLAND              [City, Town or Village] , New York 11953          [Zip Code].

This Property is in  SUFFOLK                               County. It has the following legal description:

### SEE ATTACHED LEGAL

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property";

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

Initials _____

-6A(NY) (0013).02                        Page 3 of 17                        Form 3033 1/01

Exhibit A Page 4 of 24

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (D) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

1. Borrower's Promise to Pay. I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2. Application of Borrower's Payments and Insurance Proceeds. Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

**(a) Borrower's Obligations.**

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property, which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

Exhibit A Page 6 of 24

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b) Lender's Obligations.**

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

**(c) Adjustments to the Escrow Funds.**

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If this amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior

to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

5.  Borrower's Obligation to Maintain Hazard Insurance or Property Insurance. I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period

-6A(NY) (0005).02                    Page 7 of 17          Initials: ___        Form 3033 1/01

Exhibit A Page 8  of  24

that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Borrower's Obligations to Occupy The Property. I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so, Lender may not refuse to agree unless the refusal is reasonable. I also agree not to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.

(a) Maintenance and Protection of the Property.

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b) Lender's Inspection of Property.

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

-6A(NY) (0402).03                    Page 6 of 17                    Form 3033 1/01

Exhibit A Page 9 of 24